UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Lys Ann Weiss

    v.                                    Civil No. 13-cv-376-LM
                                         Opinion No. 2014 DNH 221
Dartmouth College


**O R D E R**

The Plaintiff, Lys Ann Weiss, was – and remains – employed by the Defendant, Dartmouth College.  In this lawsuit, Ms. Weiss alleges that she was the victim of unlawful discrimination and harassment on the basis of her age and gender, and that her superiors retaliated against her for voicing her concerns.  Now, Dartmouth has filed a motion for summary judgment which, for the reasons that follow, is GRANTED.


**Factual Background[1]**

Ms. Weiss was hired in 2009 (at the age of 56) as the Managing Editor of the publishing department at Dartmouth, which operates under the trade name University Press of New England ("UPNE").  Compl. ¶ 4.  As Managing Editor, Ms. Weiss was principally responsible for ensuring that UPNE publications were thoroughly checked for errors, that UPNE had all of the

---

[1] The facts are summarized from the complaint (Document No. 1; cited as "Compl.") and the briefs and exhibits filed in connection with the motion for summary judgment.  Unless noted, the facts are not in dispute.

necessary legal permissions to publish its materials, and that all indexes and manuscripts were prepared accurately and in a timely fashion.  Dartmouth's Mem. in Supp. of Mot. for Summ. J. ("Dartmouth's Mem.") 2, Document No. 12-1.

Ms. Weiss reported directly to Eric Brooks, the Assistant Director of Design and Production.  Compl. ¶ 5.  Mr. Brooks, in turn, reported to Michael Burton, the Press Director.  Id. Another employee, Phyllis Deutsch, was UPNE's Editor-in-Chief and also reported to Mr. Burton, making her a peer of Mr. Brooks.  Id.

The allegations in this case largely involve the purported favoritism of young, female employees by Mr. Brooks, and the refusal by Ms. Deutsch and Mr. Burton to remedy the situation. The complaint alleges many examples of this favoritism:

- At a meeting in April 2011, Mr. Brooks so "lavishly praised" the work of a young, female production assistant that meeting attendees were made to feel "uncomfortable."  Id. ¶ 9. Mr. Brooks later expressed his "personal devastation" when this same production assistant announced her impending departure from UPNE.  Id.

- At another meeting attended by the same young, female production assistant, Mr. Brooks admonished Ms. Weiss and another attendee to "keep quiet" because the young production assistant "want[ed] to say something."  Id. ¶ 10.

- Mr. Brooks "spent a considerable amount of time" with another young, female assistant. Id. ¶ 11.

- In July 2011, Ms. Weiss asked Mr. Brooks if a young, female production assistant could mail an envelope, but Mr. Brooks said that Ms. Weiss should mail it herself because the young production assistant's time was "more valuable." Id. ¶ 14.

- In March 2012, Mr. Brooks informed Ms. Weiss "testily" that a young, female designer would be allowed to temporarily store page proofs in her office, a departure from standard office procedure. Id. ¶ 19.

- In April 2012, Mr. Brooks defended the work of a young, female production assistant when confronted by Ms. Weiss with perceived shortcomings in the work. Id. ¶ 23.

- At approximately the same time, Mr. Brooks told Ms. Weiss to "butt out" when Ms. Weiss came to him with concerns about email correspondence between a young, female designer and a freelance editor. Id. ¶ 24.

- At a meeting in July 2012, Mr. Brooks "doted on [a young, female production assistant's] recent experience at volleyball camp." Id. ¶ 31.

- Mr. Brooks allegedly held doors for other employees, but not for Ms. Weiss. Dartmouth's Mem. 4.

The complaint alleges that Ms. Weiss initially brought her concerns regarding the perceived favoritism to the attention of Ms. Deutsch, who indicated that she had observed the behavior herself, and who promised that she would address the situation with Mr. Burton. Compl. ¶ 12. Separately, Ms. Weiss raised the issue directly with Mr. Burton at a meeting in May 2011; Mr.

Burton allegedly indicated that the favoritism was already on a list of issues to discuss with Mr. Brooks.[2]  Id. ¶ 13.

Prior to the first of these events, Mr. Brooks had expressed concern to Ms. Weiss regarding her unsatisfactory attendance and failure to meet deadlines.  In November 2010, Mr. Brooks wrote an email to Ms. Weiss, stating "I'm just starting to get a little bit concerned about people in the department not being here by 9:00 at the latest on a more consistent basis and wanted to share my general expectations with you."  See Exh. H to Aff. of Eric Brooks, Document No. 12-16.  Then, in May 2011, Ms. Weiss received an annual review that noted that "[w]hereas, in general, [Ms. Weiss] and her staff have done a very good job adhering to schedules, there have been a few spells and a few instances where books have fallen off schedule in ways not entirely explicable by the complications inherent in the projects themselves."  See id. at Exh. C, Document No. 12-11.

During approximately the same period of time, Mr. Brooks and Mr. Burton began noting friction between Ms. Weiss and others at UPNE.  In March 2011, Mr. Burton contacted Dartmouth's Human Resources Department with concerns that Ms. Weiss had reacted inappropriately to Mr. Brooks having made a managerial

_____

[2] Ms. Weiss recorded many of these events in a lengthy diary that she kept from July 2011 until her departure from UPNE in September 2012.  See Def.'s First Req. for Admis. to Pl., Document No. 12-7.

decision without consulting her.  Aff. of Michael Burton ¶ 8,
Document No. 12-17.  According to Mr. Burton, Ms. Weiss "was
absent [from] work for two days [after the incident], and
refused to work on a project because she was upset at not being
consulted."  Id.

The record suggests that Mr. Brooks's November 2010 email
did little to alter Ms. Weiss's unsatisfactory pattern of
attendance.  Between December 2011 and April 2012, Ms. Weiss was
absent from the office for eighteen days and missed at least a
portion of twenty-three additional days.  Aff. of Eric Brooks ¶
15, Document No. 12-8.  At the same time, many of the projects
for which Ms. Weiss had responsibility were significantly behind
schedule.  See id. at Exh. D, Document No. 12-12.

And, Dartmouth suggests that Ms. Weiss continued to be a
source of interpersonal strife and office friction.  For
example, in May 2012, Mr. Brooks gave Ms. Weiss her annual
employment evaluation.  See Exh. C to Aff. of Michael Burton,
Document No. 12-20.  In addition to noting her attendance
shortcomings, Mr. Brooks wrote that "[o]f the greatest concern
is that . . . [Ms. Weiss] has become increasingly uncooperative
and intransigent.  Simultaneously, she has been . . .
inexplicably inhospitable toward two of the new members of the
department . . . .  For example, her reaction to errors in
composition . . . made one colleague feel harassed."  Id.

After Ms. Weiss submitted a response to the evaluation, Dartmouth arranged for mediation between Ms. Weiss and her supervisors; this was unsuccessful.[3]  Compl. ¶¶ 26-27. Thereafter, the complaint suggests that Ms. Weiss was prohibited from speaking with coworkers about non-work-related issues and was required to arrive at work by 9:00 a.m.[4]  Id. ¶¶ 27-28.

The parties offer competing interpretations of these events.  Ms. Weiss argues that her negative evaluation was retaliation for her decision to report her beliefs regarding Mr. Brooks's favoritism of younger women to Mr. Burton and Ms. Deutsch.  Dartmouth takes the position that the evaluation reflected long-standing and well-documented concerns regarding Ms. Weiss's performance and attendance.

On September 21, 2012, Ms. Weiss resigned from her position with UPNE and took a position in Dartmouth's Art History Department.  Id. ¶ 33.  The complaint alleges that this new position entailed a lower salary and reduced benefits.[5]  Id.

_____

[3] As part of her response to the evaluation, Ms. Weiss contended that a number of her absences were attributable to stress stemming from the workplace.

[4] During the summer of 2012, Ms. Weiss filed an informal complaint with Dartmouth's Institutional Diversity and Equity Department.  Compl. ¶ 32.  Ms. Weiss was later informed that, upon investigation, no pattern of age or gender discrimination had been discovered.  Id.

[5] Ms. Weiss appears to remain employed in this new position. See Dartmouth's Mem. 2.

Ms. Weiss alleges that although she resigned voluntarily, her departure from UPNE amounts to a constructive discharge. Id.  She has brought an array of claims sounding in age and gender-based discrimination and harassment, and unlawful retaliation, under the New Hampshire Law Against Discrimination, N.H. Rev. Stat. Ann. § 354-A:1 et seq. ("NH LAD"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA").  Dartmouth now moves for summary judgment.

## Legal Standard

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Ponte v. Steelcase Inc., 741 F.3d 310, 319 (1st Cir. 2014) (citations omitted); see also Fed. R. Civ. P. 56(a).  When ruling on a motion for summary judgment, the court must "view[] the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Winslow v. Aroostook Cnty., 736 F.3d 23, 29 (1st Cir. 2013) (citations omitted) (internal quotation marks omitted).

"The object of summary judgment is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Dávila

v. Corporación de P.R. para la Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007) (citations omitted) (internal quotation marks omitted).  "[T]he court's task is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)).

## Discussion

Ms. Weiss's nine claims fall into three categories.  Counts I through III allege unlawful discrimination on the basis of age and gender; Counts IV through VI allege gender and age-based harassment resulting in a hostile work environment; and Counts VII through IX allege unlawful retaliation.  The court will assess each category in turn.

I.   Counts I-III - Discrimination Based on Age and Gender

In Counts I, II, and III, Ms. Weiss has brought claims for age and gender discrimination under the NH LAD, Title VII, and the ADEA, respectively.  Though these claims are grounded in separate statutory schemes, the court will address them together because all three require the court to conduct its analysis in an identical fashion under the so-called McDonnell Douglas burden-shifting framework developed by the Supreme Court to

evaluate claims of employment discrimination.[6]  See Santiago-
Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53-54 (1st
Cir. 2000) (applying McDonnell Douglas to a Title VII claim for
gender discrimination); Madeja v. MPB Corp., 821 A.2d 1034, 1042
(N.H. 2003) (noting that New Hampshire courts rely on Title VII
cases to analyze claims brought under the NH LAD); Adamson v.
Walgreens Co., 750 F.3d 73, 78-79 (1st Cir. 2014)) (applying
McDonnell Douglas to an ADEA claim).

Courts employ the McDonnell Douglas framework where, as
here, the plaintiff lacks direct evidence of discrimination.
Adamson, 750 F.3d at 78 (citing McDonnell Douglas Corp. v.
Green, 411 U.S. 792, 802-05 (1973)).  This framework first calls
upon the employee to establish a prima facie case of
discrimination by producing evidence that shows: "(1) that [she]
was at least forty years old when [she] was fired;[7] (2) that
[her] job performance met the employer's legitimate
expectations; (3) that [she] suffered an adverse employment
action such as firing; and (4) that the employer filled the

---

[6] See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

[7] Of course, the first element in a claim for gender-based
discrimination differs.  Instead of proving that she was at
least forty years of age, a plaintiff in a gender-based suit
must prove that she is a member of a protected class.  Santiago-
Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st
Cir. 2000).  Title VII prohibits discrimination on the basis of,
among other traits, sex, and there is no dispute that Ms. Weiss
is a member of a protected class.  42 U.S.C. § 2000e-2(a)(1).

position, thereby showing a continuing need for the services that [she] had been rendering." Melendez v. Autogermana, Inc., 622 F.3d 46, 50 (1st Cir. 2010).  Because the plaintiff bears the burden of proving that unlawful discrimination was the but-for cause of the adverse employment action, Adamson, 750 F.3d at 78, a failure to establish a prima facie case will necessitate judgment for the employer.

If an employee establishes a prima facie case, it advances the analysis to step two of the McDonnell Douglas framework and "gives rise to a rebuttable presumption of discrimination and shifts the burden of production – but not persuasion – 'to the employer to articulate a legitimate, non-discriminatory reason for its decisions.'"  Id. (quoting Velez v. Thermo King de P.R., Inc., 585 F.3d 441, 447 (1st Cir. 2009)).

In the third and final step, "[i]f the employer meets this burden, 'the focus shifts back to the plaintiff, who must then show, by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory.'"  Id. at 78-79 (quoting Gomez-Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 662 (1st Cir. 2010)).  At the summary judgment stage, a plaintiff need not prove her case, but must "proffer sufficient evidence to raise a genuine issue of

material fact as to whether [she] was fired because of [age or membership in a protected class]."  Id. at 79.

### A.   The Prima Facie Case

Even when viewing the record in the light most hospitable to Ms. Weiss and indulging all reasonable inferences in her favor, as the court must, Winslow, 736 F.3d at 29, Ms. Weiss has not met her burden to provide sufficient evidence establishing a prima facie case of discrimination on the basis of age or gender.  The third element of a prima facie claim for discrimination plainly requires that the plaintiff proffer evidence that he or she suffered an adverse employment action. Melendez, 622 F.3d at 50.

"An adverse employment action is one that affects employment or alters the conditions of the workplace." Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010) (quoting Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 61-62 (2006) (internal quotation marks omitted)).  Such an action "typically involves discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  Id. (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) (internal quotation marks omitted)).  To be adverse, an employment action

must "materially change the conditions of plaintiffs' employ."
Gu v. Bos. Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002). "A
materially adverse change . . . 'must be more disruptive than a
mere inconvenience or an alteration of job responsibilities.'"
Morales-Vallellanes, 605 F.3d at 35 (quoting Marrero v. Goya of
P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002)).

Ms. Weiss concedes that Dartmouth did not terminate her
employment.  See Compl. ¶ 33 ("[Ms. Weiss] resigned from her
position at UPNE and took a position in another department of
Dartmouth . . . .").  Instead, Ms. Weiss contends that she
suffered an adverse employment action because Dartmouth
constructively discharged her.  Of course, "[a]n employer cannot
accomplish by indirection what the law prohibits it from doing
directly.  Just as the ADEA bars an employer from dismissing an
employee because of his age, so too it bars an employer from
engaging in a calculated, age-inspired effort to force an
employee to quit."  Suárez v. Pueblo Int'l, Inc., 229 F.3d 49,
54 (1st Cir. 2000).  If a plaintiff can demonstrate that such an
effort was undertaken, he or she may base a viable employment
discrimination claim on a theory of constructive discharge.  Id.

"To take the measure of a claim of constructive discharge,
an inquiring court must gauge whether the working conditions
imposed by the employer had become so onerous, abusive, or
unpleasant that a reasonable person in the employee's position

12

would have felt compelled to resign." Id.  While the plaintiff may subjectively view the circumstances giving rise to the end of the employment relationship as onerous, abusive and the like, "the ultimate test is one of objective reasonableness." Id. (citing Serrano-Cruz v. DFI P.R., Inc., 109 F.3d 23, 26 (1st Cir. 1997)).  The First Circuit has colorfully noted that "[t]he workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins – thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world.  Thus, the constructive discharge standard, properly applied, does not guarantee a workplace free from the usual ebb and flow of power relations and inter-office politics." Id.

To be sure, courts have credited claims of constructive discharge, but these cases generally involve employees facing truly egregious circumstances.  See, e.g., Marrero, 304 F.3d at 28-29 (employee faced more than a year of verbal and physical sexual harassment and assault from a colleague); EEOC v. Univ. of Chi. Hosps., 276 F.3d 326, 332 (7th Cir. 2002) (employee faced discrimination on the basis of her religion, then arrived at work to find her belongings packed and her office being used for storage); Acrey v. Am. Sheep Indus. Ass'n, 981 F.2d 1569, 1574 (10th Cir. 1992) (supervisor treated employee as "incapable

and uneducable" and asked employee to quit or be fired, citing her age and "image").

Ms. Weiss's allegations are of an entirely different ilk. Even if it is true that Mr. Brooks disproportionately praised the work of younger females to the exclusion of Ms. Weiss, or (consciously or not) held open doors for employees other than Ms. Weiss, these perceived injustices (and others that are similar) pale in comparison to the truly onerous circumstances necessary to give rise to a claim for constructive discharge.

Ms. Weiss makes much of the fact that, following her annual review in May 2012, she was apparently excluded from certain staff meetings, was required to be at work by 9 a.m., and was prohibited from having non-work-related discussions with colleagues.  See Pl.'s Mem. of Law in Supp. of Objection to Def.'s Mot. for Summ. J. ("Pl.'s Mem.") 15, Document 15-1.  Even putting aside Ms. Weiss's attendance issues and fractious relationships with her colleagues which might explain these actions, the First Circuit has held that "a reduction in responsibility or a change in the way that business is done, unaccompanied by diminution of salary or some other marked lessening of the quality of working conditions, does not constitute a constructive discharge." Suárez, 229 F.3d at 55. Ms. Weiss has thus failed to establish a prima facie case of discrimination because she cannot demonstrate facts suggesting

14

that she was constructively discharged or otherwise suffered an adverse employment action.

### B. Unlawful Pretext for Discrimination

Furthermore, even were the court to look beyond the shortcomings in her prima facie case and proceed with the McDonnell Douglas burden-shifting analysis, Ms. Weiss would be unable to satisfy her obligation to demonstrate that any perceived adverse employment action was merely a pretext for unlawful discrimination. Adamson, 750 F.3d at 78-79. Ms. Weiss concedes that by pointing to her attendance and performance shortcomings, Dartmouth has satisfied the second prong of the McDonnell Douglas analysis to provide a legitimate, non-discriminatory reason for her May 2012 evaluation and subsequent discipline. See Pl.'s Mem. 21. Ms. Weiss must then show, by a preponderance of the evidence, that Dartmouth's articulated reasons are "pretextual and that the true reason for the adverse action is discriminatory." Adamson, 750 F.3d at 78-79 (quoting Gomez-Gonzalez, 626 F.3d at 662). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer

did not act for the asserted non-discriminatory reasons."
Gomez-Gonzalez, 626 F.3d at 662-63 (citations omitted).

The record amply supports Dartmouth's contention that Ms.
Weiss's May 2012 evaluation and the resulting discipline were
reasonably tied to long-running and carefully chronicled
performance deficiencies.  Mr. Brooks had discussed Ms. Weiss's
late arrivals with her by email as early as November 2010, and
Ms. Weiss's May 2011 annual review noted that several of her
projects were behind schedule.  These same attendance and
productivity problems continued over the course of the next
year, and culminated in the May 2012 review.  Given these facts,
Ms. Weiss simply cannot point to the type of weakness or
inconsistency in Dartmouth's explanation that would allow her to
establish a pretextual motive.  Cf. Billings v. Town of Grafton,
515 F.3d 39, 56 (1st Cir. 2008) (defendant employer offered
"different and arguably inconsistent" explanations for
transferring the plaintiff after she complained of harassment).

Thus, even had the court found that Ms. Weiss established a
prima facie case of discrimination, Ms. Weiss could not satisfy
the separate requirement of the McDonnell Douglas framework to
show unlawful pretext.  As such, Dartmouth is entitled to
summary judgment on Counts I through III.

II. <u>Counts IV-VI – Harassment and Hostile Work Environment</u>

Counts IV, V, and VI allege harassment resulting in a hostile work environment, and are brought under the NH LAD, Title VII, and the ADEA, respectively. Each of these claims requires Ms. Weiss to demonstrate that "she was subjected to severe or pervasive harassment that materially altered the conditions of her employment." Noviello v. City of Bos., 398 F.3d 76, 92 (1st Cir. 2005) (Title VII); Collazo v. Nicholson, Civil No. 05-1783 (GAG), 2006 U.S. Dist. LEXIS 67589, at *11-12 (D.P.R. Sept. 20, 2006), aff'd, 535 F.3d 41 (1st Cir. 2008) (ADEA); Madeja, 821 A.2d at 1042 (NH LAD). "The harassment must be 'objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" Noviello, 398 F.3d at 92 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998)). In determining whether a reasonable person would find conduct hostile or abusive, courts must mull the totality of the circumstances, including factors such as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., 510 U.S. 17, 23 (1993).

Hostile work environment cases in which courts have found actionable harassment demonstrate truly abhorrent behavior on the part of the plaintiff's colleagues or superiors.  See, e.g., Billings, 515 F.3d at 48 (defendant supervisor repeatedly stared at plaintiff's breasts over an extended period of time and joked that plaintiff was "under [his] desk" when asked of her whereabouts); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 397-98 (1st Cir. 2002) (defendant coworker stalked plaintiff for over a year, massaged her without consent, and followed her home after work); Kang v. U. Lim Am., Inc., 296 F.3d 810, 817 (9th Cir. 2002) (Korean plaintiff endured verbal and physical abuse based on his national origin).

The circumstances that Ms. Weiss alleges resulted in a hostile work environment at UPNE effectively fall into two categories.  On the one hand, there are the episodes where Ms. Weiss perceived that Mr. Brooks favored or "doted on" young, female employees.  On the other hand, there are the alleged acts of retaliation that followed Ms. Weiss reporting her concerns to Mr. Burton and Ms. Deutsch, including the May 2012 evaluation and the subsequent requirement that Ms. Weiss arrive at the office by 9 a.m.

The First Circuit has warned that "[t]he highly fact-specific nature of a hostile environment claim tends to make it difficult to draw meaningful contrasts between one case and

18

another for purposes of distinguishing between sufficiently and insufficiently abusive behavior." Billings, 515 F.3d at 49. Nevertheless, the plaintiff's mere discomfort or a lack of civility in the workplace are not enough to meet the standard of actionable harassment. Ponte, 741 F.3d at 320. Whether one views Ms. Weiss's allegations individually or collectively, they are simply not objectively offensive, hostile, or abusive such that they permit a finding of actionable harassment. This is particularly true when the allegations are viewed in light of the factors set forth in Harris, and when they are compared to the circumstances courts have previously found to give rise to viable hostile work environment claims. The handful of alleged acts of workplace favoritism took place sporadically over a period of time spanning nearly eighteen months. What is more, while Mr. Brooks's excessive attention to young, female employees may have been untoward and unprofessional, his behavior, in contrast to those cases that have found actionable conduct, was not severe, threatening, or humiliating to Ms. Weiss. Nor are Mr. Brooks's actions alleged to have interfered with Ms. Weiss's work performance.

Likewise, Ms. Weiss cannot establish that her evaluation or the subsequent discipline constitute actionable harassment because the record supports Dartmouth's contention that they were prompted by long-standing and legitimate concerns. For

these reasons, Dartmouth is entitled to summary judgment on Counts IV through VI.

III.  Counts VII-IX – Retaliation

In Counts VII, VIII, and IX, Ms. Weiss asserts claims for unlawful retaliation under the NH LAD, Title VII, and the ADEA, respectively.  Where, as here, the allegations of retaliation are based on circumstantial evidence (rather than direct proof of retaliatory motive), courts employ the now-familiar McDonnell Douglas framework to claims brought under all three statutory schemes.  Ponte, 741 F.3d at 321 (Title VII); Ramirez Rodriguez v. Boehringer Ingleheim Pharms., Inc., 425 F.3d 67, 84 (1st Cir. 2005) (ADEA); Madeja, 821 A.2d at 1042 (NH LAD).

In the first stage of the burden-shifting framework for a prima facie showing of retaliation, "the plaintiff must show that she engaged in protected conduct, that she suffered an adverse employment action, and that a causal nexus exists between the protected activity and the adverse action."  Ponte, 741 F.3d at 321 (emphasis added); see also Ramirez Rodriguez, 425 F.3d at 84.  On this issue, Ms. Weiss runs headlong into the same obstacle that doomed her unlawful discrimination claims. Supra § I, A.  She is unable to demonstrate that she suffered an adverse employment action and, thus, she cannot establish a

prima facie case of unlawful retaliation.[8]  This being the case, Dartmouth is entitled to judgment on Counts VII through IX.

### Conclusion

For all of the reasons discussed above, Dartmouth's motion for summary judgment (Document No. 12) is granted.  The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

October 17, 2014

cc:   Pierrre A. Chabot, Esq.
      Michael S. McGrath, Esq.
      Kathleen C, Peahl, Esq.

---

[8] Even had Ms. Weiss established a prima facie case of retaliation, for the same reasons as those discussed above with respect to the discrimination claims, Ms. Weiss could not satisfy the third stage of the McDonnell Douglas framework to demonstrate unlawful pretext.  Adamson, 750 F.3d at 78-79.